**POWERLOCK FLOORS, INC., Plaintiff,**

**v.**

**ROBBINS FLOORING COMPANY,**
**Inc., Defendants.**

**Civ. A. No. 3262.**

United States District Court,
D. Delaware.

May 20, 1971.

Roger Sanders, Prickett, Ward, Burt & Sanders, Wilmington, Del., and Zachary T. Wobensmith, 2nd, Zachary T. Wobensmith, III, Philadelphia, Pa., of counsel, for plaintiff.

Henry M. Canby, Richards, Layton & Finger, Wilmington, Del., and George J. Harding, 3rd, Frank A. Follmer, Smith, Harding, Earley & Follmer, Philadelphia, Pa., of counsel, for defendants.

## OPINION

STEEL, District Judge:

This is an action for patent infringement of U. S. Letters Patent No. 3,271,-916 issued on September 13, 1966 to Ray E. Omholt for Uniformly Resilient Flooring Systems. Plaintiff is the assignee of the patent and charges that since its issuance defendant, who competes with plaintiff in the manufacture and sale of flooring, has infringed the patent by making and selling flooring systems embodying the patented invention. Accordingly plaintiff seeks an injunction and damages. Defendant denies the validity of the patent, its enforceability, and infringement, and has filed a counterclaim for a declaratory judgment of invalidity and non-infringement.

Plaintiff is a Pennsylvania corporation and defendant a Delaware corporation. Jurisdiction exists under 28 U. S.C. § 1338(a) and 35 U.S.C. §§ 281 and 283.

*The Omholt 916 Patent*

The alleged invention of the patent relates to flooring systems which utilize supporting channels. Referring to a prior patent issued to Omholt, the 916 patent states:

In my prior Patent No. 3,031,725, there is disclosed a flooring system which has proven very satisfactory in use. That flooring system includes channels secured to a supporting base and to which the floor boards are secured by spaced clips, with splines engaging the boards interposed between the channels. (Col. 1, l. 10–15)

Omholt asserted in his 916 patent that the upper surface of the floor disclosed in the 725 patent deflected more when a load was applied at the mid-channel point than when the same load was applied directly over the channels. The invention claimed in the patent in suit was designed to overcome that condition. It relates to "improvements" in floors of the same general type as that of the 725 patent but is alleged to have controlled shock absorbency coupled with uniform rebound characteristics.

The system in claim 1 of the patent in suit may be described generally as having the following elements:

(a) a plurality of floor boards,

(b) superposed on and transversely spanning a plurality of spaced parallel supporting members on a foundation,

(c) fastening members holding the floor boards to the parallel supporting members,

(d) means for attaching the supporting members to the foundation,

(e) resilient supporting inserts in and substantially longitudinally filling the spaces between said supporting members,

(f) resilient supports interposed between the supporting members and the foundation having a different predetermined resiliency and load bearing characteristic from the resilient supporting inserts designed to balance substantially the load bearing and resilient impact

response characteristics of the floor boards in span and over the supporting members.

The "spaced parallel supporting members" are frequently referred to as "channels". In the flooring structures manufactured by plaintiff the "resilient supporting inserts" which fill the spaces between the channels are made of Acoustiflex or fiberboard and the "resilient supports" interposed between the channels and the foundation are made of rubber.

There are five claims in the patent in suit. Claims 2 through 5 vary in relatively slight particulars from. claim 1 and are dealt with later.

### Infringement

█ █ The flooring which defendant advertised through a trade publication known as the Sweet's catalogue distributed to architects from 1966 to 1968 was virtually a Chinese copy of the patented structure sold by plaintiff. However, the fact that defendant was promoting, advertising, and soliciting orders for a structure which copied that claimed by plaintiff's patent did not constitute an act of infringement unless defendant manufactured or sold an infringing product. Cf. Welding Engineers, Inc. v. Aetna Standard Co., 169 F.Supp. 146, 149 (W.D.Pa.1958). Nor is infringement established even if the defendant actually manufactured or sold flooring structures within the scope of the claims of the 916 patent either before the 916 patent was issued or after suit was begun, or both. The act of infringement must have been committed after the patent issued and before the commencement of the suit. General Steel Products Co., Inc. v. Lorenz, 204 F.Supp. 518, 540 (S.D.Fla.1962) aff'd on other grounds, 337 F.2d 726 (5th Cir. 1964).

█ The patent sued upon issued on September 13, 1966 and suit was begun on September 27, 1966. The closest thing to proof of any specific infringe-ment by defendant between these dates is Omholt's testimony that on September 21, 1966 a Lock-Tite[1] infringing structure was being installed at the Half Hollow Hills High School in Half Hollow Hills, New York. It was shown, however, that this installation was not being made by defendant but by Haywood-Berk, which was one of defendant's dealers. It was a separate entity from defendant. Omholt stated that he had no knowledge whether Haywood-Berk was owned by defendant at the time, nor was any other relationship except dealership shown. This evidence is not sufficient to support the claim that defendant manufactured and sold an infringing product between September 13 and September 27, 1966.

█ Omholt also testified that to his knowledge defendant was making and selling infringing systems continuously during 1966 and that to his knowledge there had been no cessation of these activities between September 13 and September 27, 1966. No particular sale or manufacture was specified by Omholt within the critical period. With the variety of means of discovery which were available to plaintiff, some direct or inferential proof of a specific sale or manufacture was necessary to sustain the burden which plaintiff was required to bear of proving infringement between September 13 and September 27, 1966, and Omholt's uncorroborated and generalized testimony was inadequate for that purpose. Furthermore, it cannot be assumed that defendant manufactured and sold the systems within the two week period between the issuance of the patent and the institution of the suit simply because defendant was making and selling flooring systems covered by Omholt's patent throughout 1966 as Omholt testified. Flooring structures are not sold on a daily basis with the frequency of commodities in a grocery store. Flooring structures are manufactured and sold pursuant to special contracts which are made only sporadically.

1. Defendant's trade name for its flooring structure.

## Validity

In dealing with the question of validity of the patent only the defense of obviousness under 35 U.S.C. § 103 need be considered, except as to claim 5.

██ The critical question under § 103 is not whether the alleged invention in the patent is identically disclosed or described in the prior art as required by § 102. The issue is whether the differences between the patent sued upon and the § 102 prior art are such that the subject matter of the patent as a whole would have been obvious at the time of its alleged invention to a person having ordinary skill in the art. In Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 13 L.Ed.2d 553 (1966), the Court said:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

These requirements are applicable to a combination patent such as 916 and must be strictly adhered to. Anderson's-Black Rock Inc. v. Pavement Salvage Co., 396 U.S. 57, 62, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

The scope and content of the prior art before May 6, 1964, is relevant since that is the earliest date claimed by Omholt for his invention. On June 17, 1963 plaintiff itself had installed at Salisbury, Maryland [2] a flooring structure which embodied the system of claim 1 of the patent in suit, except for one element. That element appears in the Omholt 916 patent and is described as "resilient supports interposed between said supporting members and said foundation". This is the rubber between the bottom of the channels and the foundation. Except for this, the Salisbury installation is indistinguishable from the structure covered by claim 1 of Omholt's 916 patent.

The improvement which plaintiff claims for his 916 patent is the combination of (1) the resilient supporting inserts, Acoustiflex, between the channels and (2) the resilient supports (rubber) interposed between the channels and the foundation. It is claimed by plaintiff that substantially uniform load bearing and impact response characteristics can be imparted to the surface of the floor boards by utilizing Acoustiflex and rubber having different predetermined resiliencies and load bearing characteristics. In this manner it is claimed that the quality of the flooring for industrial uses and particularly for use in gymnasiums where basketball is played is improved over any known pre-existing floor structure.

It is clear, however, that the prior art disclosed not only the two elements comprising (1) the resilient supports underlying the channels, and (2) the resilient supports between the channels, but it also revealed the principle of utilizing a combination of resilient materials underlying the channels and between them.

The Livezey patent No. 3,045,294 was issued on July 24, 1962 and ante-dated plaintiff's earliest conception date of May 6, 1964. Livezey related to a method and apparatus for laying floors consisting of a plurality of short flooring boards. Livezey recognized the obvious fact that the resilience of the conventional floor across its surface varied due to the absence of resilience at the point where flooring boards were secured to the "sleepers" [3] and the degree of resilience experienced between the sleepers where the floor boards were unsupported. He said (Col. 1, l. 54–59) : [4]

> [T]he resilience of the conventional floor varies across its surface. Where

---

2. The installation at Salisbury was an embodiment of the invention of the earlier patent No. 3,031,725 which had been issued to Omholt on May 1, 1962 except for the addition of the Acoustiflex fiberboard which filled the spaces between the channels at Salisbury.

3. The "sleepers" referred to by Livezey structurally corresponded to the "parallel supporting members" or channels referred to in the Omholt 916 patent.

4. The Livezey patent is one of a number of patents included in Dx 80.

the boards are secured to the sleepers, substantially no resilience is present; however, intermediate the sleepers, the boards are unsupported and the flooring exhibits a degree of resilience.

Livezey noted that uniformity of resilience could be achieved by placing a resilient layer of material between the entire subfloor area and the finished floor. But the primary objective of Livezey's invention was to provide another method of flooring construction designed to achieve uniform resilience over the entire floor area. He stated: (Col. 2, l. 20–24)

> With the foregoing in mind, a primary object of the present invention is to provide a method and apparatus for laying floors which provide a uniform resilience over the entire floor area without the requirement for a sheet of resilient material underlying the complete floor area.

To accomplish this Livezey provided for "sleepers" which ran transversely to the floor boards and supported them at their end points, and "auxiliary supports" which were laid parallel and "intermediate to the sleepers" and supported the floor boards at mid-span. Livezey said that (Col. 3, l. 47) "[t]he sleepers and the auxiliary supporting members preferably extend continuously across the width of the area. * * *" The patent not only provided for this dual support but it also called for resilient support members, i. e., both sleepers and auxiliary supports. The base or bottom portion of the sleepers was to be formed of "cork or a similar resilient substance", and the auxiliary support members disposed intermediate the sleepers were to be formed of "cork or other suitable resilient material." (Col. 3, l. 19–20, Col. 3, l. 26–27). By this means, the patent stated (Col. 3, l. 31):

> The board is resiliently supported against downward movement by the undersurface of the board resting on the face plate [upper surface] of the sleepers and on the auxiliary support members.

The purpose Omholt claimed for the "improvement" of the 916 patent was "for imparting substantially uniform load bearing impact response characteristics to the upper faces of the [floor] boards" (Col. 4, l. 30). This was to be accomplished, (1) by placing under the channel a "cushioning runner" (Col. 3, l. 17), and (2) by filling or substantially filling with a fiberboard the spaces between the channels and the bottom of the floor boards and the membrane which covered the foundation.[5] The cushioning runners beneath the channels were to be made of "butyl rubber, or like material with the desired characteristics of resiliency and recovery under load." (Col. 3, l. 17–20).[6] The panel inserts could be any "preferred material having the specific resiliency characteristics and recovery under load as well as being inert and not subject to mold, insect infestation or the like." (Col. 3, l. 32–35)[7] In practice Acoustiflex fiberboard was used by plaintiff.

The object of Omholt was to attain "substantially uniform load bearing and impact response" for his flooring; that of Livezey was to attain "uniform resilience over the entire floor area". Om-

---

5. Plaintiff makes no claim that the covering of the foundation with membrane was inventive.

6. The "characteristics of * * * recovery under load" are synonymous with "characteristics of resiliency". Omholt defined resiliency as "the ability of material to resume its initial shape after it has been deformed or strained." This is its dictionary meaning. Daniels v. Permutit Co., 44 F.Supp. 74, 79 (D.Del. 1942) (Goodrich, C. J.)

7. The "specific resiliency characteristics and recovery under load" are not indicated in the patent except in the following language (Col. 3, l. 35 et seq.):
> "For this purpose a fiberboard having density in the range of 16 to 33 pounds per cubic foot and the impregnation with asphaltum of the order of 15% by weight is preferred."

holt did this by placing resilient material under the channel, in practice rubber, and between the channels, in practice Acoustiflex. Livezey did this by the utilization in the two areas of a "resilient" material of which cork was an example.

Omholt claimed that the "load bearing and resilient impact response characteristics of said floor boards in span and over said supporting members" would be substantially balanced by utilizing "said resilient supports and said resilient supporting inserts having different predetermined resiliency and load bearing characteristics." (Col. 4, l. 46–51)[8] How the resiliency variation called for by the patent to balance the floor was to be determined is not stated in the patent. Nor does the patent state even in general terms the degree of resiliency variation between the supports (rubber) and inserts (Acoustiflex), required for the desired balancing. Omholt was interrogated on this subject. When asked to specify the selected rate of deformation of the material between the channels (Acoustiflex), he answered, "One which will balance with the effect given by the rubber strip under the channel." When asked what should be the selected rate of deformation of the rubber strip under the channel, he answered, "One which will give a satisfactory balance between shock absorbency and a lively floor. This is a matter of some practical experience, I think." When asked what rate he considered satisfactory in his experience, he said, "Well, empirically, one, a stiffness which will give a good lively floor, but one which will not induce shin splints[9] in [basketball] players." (Record at 439–40).

Omholt called for different predetermined resiliency characteristics of the supporting inserts (rubber runners) and the supports (Acoustiflex). Nothing in the Livezey patent prevented one who followed it from using cork or other re-silient material having different predetermined resiliencies, if different resiliencies were required to achieve uniformity in the flexibility of the floor.

On cross examination Stoehr, a well qualified expert in the flooring field, admitted to points of difference between Livezey and the Omholt 916 patent. But these differences would not have prevented the fundamental teachings of that patent and plaintiff's structure installed at Salisbury, Maryland in 1963 from making obvious the subject matter of the 916 patent to one skilled in the art. Livezey would not have invalidated claim 1 of Omholt under the § 102 prior art test. But something less than identity of the prior art is required under the obviousness test of § 103. Here the Salisbury installation plus the Livezey patent disclosure were sufficient to make obvious claim 1 under § 103. None of the physical tests which were performed requires a different conclusion.

■ In view of Livezey, Omholt's patent did not present for the first time a combination of elements old in the art which was patentable. It was merely an embodiment of an old combination concept. But even if the Omholt patent is regarded as an original concept of a combination of two old elements—resilient support under and between the channels—the aggregation provided no new or different function from that theretofore performed by them. Separately or in combination, resilient support was provided by each of the two elements at the position where it was located. Novelty of function, which is absent in the Omholt patent, is essential to the validity of a combination patent. Lincoln Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008 (1938).

■ While the combination of old elements in the Omholt 916 patent un-

8. A study of the file wrappers (Dx 16) discloses that it was the inclusion by amendment of this conception that caused the Patent Office to issue the patent after earlier claims had been rejected.

9. A type of shin soreness resulting from playing on too stiff a floor.

doubtedly performed a useful function, to one skilled in the art their use in combination was not invention by the obvious—nonobvious standard. Invention is not satisfied simply because flooring structures manufactured under the Omholt patent provided the basis for a successful venture. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 62–63, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

So far what has been said related to the validity of claim 1. Claims 2–5 are dependent claims. Claims 2–5 each specified the flooring systems of claim 1 but with minor variations.[10] Claim 3 states that the resilient insert (Acoustiflex) is to be in a continuous compressed relationshop with the lower surface of the floor boards. This was true of the Acoustiflex in plaintiff's Salisbury installation in 1963. Claim 4 states that the resilient supports (rubber which underlie the channels) shall be a continuous strip. Before Omholt's conception Livezey had stated in describing his invention that (Col. 3, l. 47) "The sleepers and auxiliary supporting members preferably extend continuously across the width of the area. * * * "

Neither Livezey nor Omholt's structure installed in Salisbury, Maryland in 1963 were called to the Patent Office's attention. They were important portions of the prior art which were not considered by it. This weakened the statutory presumption of validity of claims 1, 3 and 4 of the Omholt 916 patent. Dole Refrigerating Co. v. Amerio Contract Plate Freezers, 265 F.2d 627, 629 (3d Cir. 1959).

Claim 2 states that the members for attaching the supporting members [channels] to the foundation have portions permitting downward deflection of the supporting members [channels] but restraining upward movement thereof. The attaching members are referred to in the patent as channel anchors and are indicated by the numeral 15 in Figure 2 of the patent. Channel anchors, as such,

were old in the art when plaintiff claims to have conceived his invention. Plaintiff has used them in channel flooring since prior to 1964.

Stevens' U. S. Patent No. 2,115,238 was issued on April 26, 1938. It discloses a bolt 12 having a nut 18 which performs the function of the channel anchor of claim 2 of the Omholt 916 patent and permits the downward compression of the rubber pad 13 by permitting a downward motion of chair 14 relative to the bolt 12. However, when the chair 14 returns to its upward position the nut limits its upward movement. The function of the rubber 13 in the Stevens' patent, as in the case of the rubber under the channel in the patent in suit, is to cushion the flooring. (Record at 936–39)

Hence, the channel anchor 15 of the Omholt 916 patent, as such, is old and performs no function not performed by the bolt 12 of the Stevens' patent No. 2,115,238. The invention claimed in claim 2 would have been obvious to one skilled in the art under § 103.

Defendant's brief (at 11) accurately describes claim 5 and makes the following observation about it:

Claim 5 specifies that the resilient supports underneath the channels provide gasket seals at the intersection with the foundation and the attaching members. Omholt at T 18 testified that the gasket function of the rubber strip was to provide a seal where the shot ruptures the membrane (in terms of the patent this would occur where anchor 15 passes through membrane 40). However, the membrane (40) is not included in claim 1, in claim 4 which depends from claim 1 or in claim 5 which depends from claim 4. Thus, according to claim 5 the resilient supports (runners 41) lie directly on the concrete with no membrane present. Since a membrane (40) is used to seal against moisture passing upwardly from the concrete, it is obviously useless to use separated rub-

---

10. Claim 5 does this indirectly by referring to claim 4 which in turn refers to claim 1.

ber strips without a membrane to attempt to seal against the concrete.

What has been said by defendant about claim 5 is adopted as the view of the Court and paraphrasing would add nothing. Claim 5 fails to describe anything useful and fails to meet the requirement of § 101.

 The Omholt patent No. 3,271,916 is neither valid nor has it been infringed by defendant.

This opinion constitutes the findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P.

Let a judgment be submitted by defendant which has been approved as to form by plaintiff.