**ALLEGHENY DROP FORGE COMPANY, Plaintiff,**

v.

**PORTEC, INC., Defendant.**

**Civ. A. No. 72–558.**

United States District Court,
W. D. Pennsylvania.

Feb. 14, 1974.

**674**

John L. Spiegel, Plowman & Spiegel, Stanley J. Price, Jr., Pittsburgh, Pa., for plaintiff.

Hyman F. Glass, Alexandria, Va., J. Paul Martha, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION

DUMBAULD, District Judge.

Plaintiff's complaint seeks a declaratory judgment (under 28 U.S.C. § 2201) that two patents of which defendant is exclusive licensee are invalid. The Court has jurisdiction of actions relating to patents under 28 U.S.C. § 1338(a), and the technique of seeking a declaratory judgment of invalidity rather than awaiting an infringement suit by defendant is a recognized procedure. Dewey & Almy Chemical Co. v. Anode, Inc., 137 F.2d 68, 69–70 (C.C.A. 3, 1943); Thiokol Chemical Corp. v. Burlington Industries, Inc., 448 F.2d 1328, 1331 (C.A. 3, 1971). Before us for disposition is plaintiff's motion for summary judgment, based upon three grounds: (1) obviousness under 35 U.S.C. § 103;[1]

---

1. 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 102 reads:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only

(2) prior filing in a foreign country contrary to 35 U.S.C. §§ 184 and 185;[2] (3) unclean hands, it being alleged that defendant withdrew an interference pending before the patent office in order to "cover up" (to use a phrase popular at this moment of time) prior art which would have prevented issuance of the patents involved, and thereby to facilitate their issuance.

In all patent cases certain basic principles must be kept in mind.

It must never be forgotten that the primary policy of the patent laws is to promote invention for the benefit of the public. Private gain is secondary. Pennock v. Dialogue, 2 Pet. 1, 7 L.Ed. 327 (1829); Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510–511, 37 S.Ct. 416, 61 L.Ed. 871 (1917); Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376 (1944); Mazer v. Stein, 347 U.S. 201, 219, 74 S. Ct. 460, 98 L.Ed. 630 (1954); Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330–331, 65 S.Ct. 1143, 89 L. Ed. 1644 (1945); Dumbauld, The Constitution of the United States (1964) 153–154. A valid patent must add to, not detract from, the state of the prior art. As stated in Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950): "The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans." Hence it is a public service to strike down an invalid patent, which is in truth a trespass upon the public domain, as Justice Douglas observed in Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 840, 70 S.Ct. 894, 94 L.Ed. 1312 (1950).

The very power of Congress to grant a patent is limited and delineated by the purpose proclaimed in the constitutional grant itself. The power is one "To promote the Progress of Science and useful Arts"; the "exclusive Right" conferred by the patent is merely the means of accomplishing the intended result. *Ibid.*, 836–837, 70 S.Ct. 899; Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 154–156, 71 S.Ct. 127, 95 L.Ed. 162 (1950); U. S. Const. Art. I, sec. 8, cl. 8.

"It follows from the language used in the Constitution, limiting patentability

the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

2. 35 U.S.C. § 184 provides:

Except when authorized by a license obtained from the Commissioner a person shall not file or cause or authorize to be filed in any foreign country prior to six months after filing in the United States an application for patent or for the registration of a utility model, industrial design, or model in respect of an invention made in this country. A license shall not be granted with respect to an invention subject to an order issued by the Commissioner pursuant to section 181 of this title without the concurrence of the head of the departments and the chief officers of the agencies who caused the order to be issued. The license may be granted retroactively where an application has been inadvertently filed abroad and the application does not disclose an invention within the scope of section 181 of this title.

The term "application" when used in this chapter includes applications and any modifications, amendments, or supplements thereto, or divisions thereof.

35 U.S.C. § 185 invalidates a patent issued in violation of the license requirement:

Notwithstanding any other provisions of law any person, and his successors, assigns, or legal representatives, shall not receive a United States patent for an invention if that person, or his successors, assigns, or legal representatives shall, without procuring the license prescribed in section 184 of this title, have made, or consented to or assisted another's making, application in a foreign country for a patent or for the registration of a utility model, industrial design, or model in respect of the invention. A United States patent issued to such a person, his successors, assigns, or legal representatives shall be invalid.

35 U.S.C. § 181 furnishes a procedure for preventing disclosure detrimental to the national security.

to inventions which in fact contribute to the 'progress' of science, that every case involving the validity of a patent presents a constitutional question. Hence the Supreme Court of the United States is often required to devote its time and effort to determinations involving minute questions of fact with respect to the patentability of trivial gadgets."[3]

■■ It follows also, from these basic policies, that commercial success alone, without the requisite invention and novelty, will not establish patentability. Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Anderson's Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 59, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). It further follows that the mere discovery of a phenomenon or law of nature is not patentable. Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948).

■■ It must also be borne in mind that under the 1952 amendment the requirement of novelty is no longer to be interpreted, as in the days of Thurman Arnold, as requiring a "flash of genius."[4] 35 U.S.C. § 103 now states "Patentability shall not be negatived by the manner in which the invention was made." A computerized search, or mere methodical exhaustion of alternatives, might now suffice. Cf. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 335, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945). An accidental discovery is now patentable. Gagnier Fibre Products Co. v. Fourslides, Inc., 112 F.Supp. 926, 929 (E.D.Mich.S.D., 1953). At the same time, 35 U.S.C. § 103, as interpreted in the leading case of Graham v. John Deere Co., 383 U.S. 1, 16–17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), added a new requirement of "non-obviousness." This requirement, it seems clear, did not lower the level of inventiveness required. If anything, it increased it by making a statutory requisite of criteria theretofore embodied only in judicial decisions. 383 U.S. at 17, 86 S.Ct. 684.

■ It is true, of course, that the 1952 legislation was designed to lessen the hostility to patents which led to Justice Robert H. Jackson's quip that "the only patent that is valid is one which this Court has not been able to get its hands on." Jungerson v. Ostby & Barton Co., 335 U.S. 560, 573, 69 S.Ct. 269, 274, 93 L.Ed. 235 (1949); Reiner v. I. Leon Co., 285 F.2d 501, 503 (C.A. 2, 1960) [*per* Learned Hand]. Nevertheless, the requirement of "non-obviousness" was an additional statutory hurdle to the inventor. He was made chargeable with what he should have known, under the prior art, rather than merely with what was explicitly disclosed by the inventions of his predecessors in the art. See Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 535–536 (C.A. 2, 1955) [*per* L. Hand]. The pre-1952 statutory criterion ("new and useful") now appears in 35 U.S.C. §§ 101 and 102.

In the light of these doctrines we proceed to examine the facts shown by the record in the case at bar. We turn first to the *sedes materiae*, the terms of the patents themselves which are involved in the instant controversy.

Patent No. 3,100,080 (Ex. 1) was issued on August 3, 1963, pursuant to an application filed on May 27, 1957, on behalf of René A. Fiechter, assignor to American Railroad Curvelining Corporation. It is entitled "Railway Rail Joint." Eleven claims were allowed.

Patent No. 3,139,364 (Ex. 27) was issued on June 30, 1964, pursuant to an application filed on November 3, 1958, by the same inventor and assignee. It is entitled "Method of Making Railway Track." Two claims were allowed.

3. Dumbauld, The Constitution of the United States (1964) 154.

4. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Monsanto Chemical Co. v. Coe, 79 U.S.App.D.C. 155, 145 F.2d 18, 23 (1944).

Defendant has received an exclusive license to these patents, and on December 27, 1971, wrote to plaintiff, charging plaintiff with infringement but offering a non-exclusive license thereunder (Ex. 37, attached to plaintiff's brief, which has been ordered to be filed).

The file wrapper of No. 3,100,080 (Ex. 2) shows that the original application was for "Railway Rail Joint and Method of Forming It" and contained 15 claims. Nos. 12–15 related to method, and during the course of prosecution were withdrawn on June 20, 1961. They were elaborated and resubmitted in the continuation-in-part application containing 15 claims which led to patent No. 3,139,364 (File wrapper of No. 3,139,364, Ex. 29). For simplicity we shall therefore hereinafter refer to No. 3,100,080 as the "joint" patent and No. 3,139,364 as the "method" patent.

The general purpose of the joint patent is to provide a continuous rail surface (previously obtainable by welding) but which will readily permit the replacement of individual rails. Accordingly the rail ends are bonded together by a suitable bonding agent (a thermo-setting[5] synthetic resin such as epoxy) and the rails may also be bonded to "fish plates" (also called side plates, splice plates, or joint bars, which are parallel to the rails and before welded rails would be bolted together to hold the rail ends in place) or to "tie plates" which go between the rails and cross-ties. The tensile strength of the bonding agent is such that rails may readily be pulled apart for replacement, but its other properties are such that the joint will withstand the mechanical strains of train movement and fluctuations of weather and temperature.

More specifically, the basic feature of the joint patent is set forth in Claim No. 1:

A railroad rail joint comprising rail end portions and at least one additional metallic element having a surface complementary to at least a substantial proportion of the lateral surfaces of said rail end portions, said end portions and said element being substantially rigidly bonded together by the interposition throughout at least a major proportion of said complementary surfaces of a thermo-setting synthetic resin bonding agent.[6]

The method patent in Claim No. 2 provides for "curing" the thermosetting filling material to harden it, holding the metallic elements in place "by clamping means" until the bonding material has hardened. The clamping device is then removed, having been "pre-treated with a non-sticking agent, such as a silicone."

Claim No. 1 provides for more rapid curing by use of heat. It also covers an "interference fit" produced by differential heating of two interlocking metal elements, so that the cooler fish plates will expand less than the rails and produce a tight fit when both are then heated uniformly to a higher temperature sufficient to harden the paste.

The rail joints may be made electrically conducting by placing the surfaces in contact; or may be made non-conducting by inserting an insulator to prevent such contact. The bonding agent itself is a non-conductor.

---

5. A "thermo-setting" agent (unlike a "thermoplastic" agent) can not be resoftened by heat once it has hardened (or "cured").

6. The other ten claims allowed represent trifling variations of Claim No. 1. No. 2 specifies such a joint with bonding agent of capillary thickness. No. 3 covers the situation where both the butt ends of the rail are bonded together and are also bonded to another metallic element. No. 4 covers use of a shim between the butt ends of the rails. No. 5 calls for use of fish plates. No. 6 includes bolts which are bonded to the rails and to the fish plates. No. 7 covers substitution of a metallic sleeve for the fish plates. No. 8 provides for bonding the butt ends of the rails as well as the metallic sleeves. No. 9 adds a shim to No. 8. No. 10 specifies a particular composition of the bonding agent. No. 11 contemplates an end post between the rail ends and bolted joint bars with the bonding compound filling the spaces so as to transmit stress from one rail to the other.

The method patent claims read as follows *in haec verba*:

1. The method of constructing railway tracks, wherein mutually adjoining elements such as abutting rail ends, rails and fish-plates, rails and tie-plates, rails and anticreep devices, tie-plates and ties are juxtaposed with certain respective surfaces normally contacting, which includes the steps of assembling normally abutting parts of said elements into operational position interposing between the otherwise contacting surfaces of said mutually adjoining elements a filling material composed predominantly of thermosetting resins of the type including an epoxy group, the filling material being applied in liquid form in such manner as to substantially fill all the interstices of the mutually abutting surfaces of said elements to be adhesively secured to one another, and then curing said material to harden it, the filling material having the property of being capable of accelerated curing under moderate heat, said method including the step of heating the elements to be joined, after applying the filling material to the surfaces of said elements, to a temperature sufficient to bring about rapid curing of the filling material, and producing an interference fit between two joined elements, one male and the other female, by differential heating of said elements and forcibly pressing them together, the female element being raised to a higher temperature than the male element, said higher temperature however not being high enough to cause premature hardening of the filling material, and both elements being subsequently raised, while maintaining the pressure, to the "accelerated hardening" temperature, the consequent differential expansion of the elements bringing about the interference fit.

2. The method of constructing railway tracks wherein mutually adjoining elements such as abutting rail ends, rails and fish-plates, rails and tie-plates, rails and anticreep devices, tie-plates and ties are juxtaposed with certain respective surfaces normally contacting, which includes the steps of assembling normally abutting parts of said elements into operational position, interposing between the otherwise contacting surfaces of said mutually adjoining elements a filling material composed predominantly of thermosetting resins of the type including an epoxy group, the filling material being applied in liquid form in such manner as to substantially fill all the interstices of the mutually abutting surfaces of said elements to be adhesively secured to one another, and then curing said material to harden it, elements to be joined to each other being held together by clamping means until the filling material is fully hardened, the clamping means being pretreated with a nonsticking agent, such as a silicone, enabling it to be removed after the filling material has fully hardened.

It should be noted that neither patent claims any invention with respect to the composition of the bonding agent. The specifications of the joint patent in fact express a preference for use of "the ethoxyline resin known as 'Araldite' Type I (the Ciba brand of a reaction product of epichlorohydrin and p.p′—isopropylidine bisphenol)." The specifications of the method patent likewise recommend the use of products marketed by Ciba S.A. under the brand names "Araldite I" and "Araldite 123–B" (together with a hardening agent identified as 953–N or 953–B). Apparently Fiechter's use of glue in the railroad field was undertaken in cooperation with Ciba, but if any new technology resulted from such developments no patent claims in that connection were made by Fiechter. (See Fiechter affidavit of July 24, 1962, Ex. 23).

Examination of the file wrappers shows that both patents resulted from post-final-rejection-prosecution. As to the joint patent, during the dialogue between the applicant and the examiners,

the principal reason for rejection was that prior patents (notably Hobbs, No. 1,659,976, February 21, 1938, Ex. 3) showed a rail joint where a side plate is welded to the rail ends, while other prior patents (notably a British patent to Ciba, the manufacturer of the adhesive found preferable by applicant, No. 630,663, October 18, 1949, Ex. 3) showed that thermoplastic resin bonding agents could be used to unite various metals, including steel, copper, and iron. (See also Ex. 30). The examiners therefore found no invention in employing the known adhesive for use in rail joints to serve the purpose of effecting the adhesion formerly obtained by welding. To distinguish from Hobbs, applicant amended on April 12, 1961, to require that the glue be applied "throughout at least a major proportion of said complementary surfaces" to be bonded.

Plaintiff argues that such extension of the area to be bonded shows no inventiveness, but would be practiced by or obvious to anyone engaged in the art. This is true, though it is a distinction from the Hobbs patent. It is just as if an efficient office boy sealing an envelope were to moisten the entire adhesive surface before closing the flap, rather than just giving "a lick and a promise."

On July 28, 1959, applicant submitted affidavits showing the novel and unexpected results of his method, and how railroad men had been skeptical and did not believe it could be done and denied funds for research. Further similar data were submitted at an interiew between examiner, applicant, and his Washington and New York attorneys on June 9, 1961. The final rejection on May 8, 1961, had stated that such data would be more convincing if it were shown that the railroad men were familiar at the time with the state of technology with respect to adhesives. At the June 9 meeting applicant submitted affidavit dated May 26, 1961, of the Assistant General Superintendent of the New York subway to whom applicant had proposed glued joints in November; 1956. Affiant viewed the matter with caution, although "Certainly I, as well as many other people, were at that time and have been well aware of the fact that adhesives have been used in industry for the gluing of metals, woods, plastics, etc. However, we were further well aware that this work was performed under very strict control and under . . . conditions which . . . did not and do not occur on the average railroad track." The Chief Engineer of a railroad first approached by applicant in May, 1957, at that time "was familiar with certain uses of glue for industrial applications. I did not believe, however, that these uses could be applied to railroad track construction."

After amendments filed June 21, 1961, the examiner acquiesced on September 5, 1961, in applicant's position, subject to amendments in certain formal respects filed September 14, 1961. Notice of allowance was mailed October 26, 1961, but withdrawn from issue November 9, 1961, for purposes of interference set up on April 6, 1962, with an application by Philip J. Kirst, assigned to defendant. The file wrapper merely records a decision on priority "Favorable" to applicant, and notice of allowance mailed June 26, 1963.[7]

Regarding the method patent, the file wrapper history shows that the application, a continuation-in-part of the original application of May 27, 1957, and elaborating in 20 claims the method claims (Nos. 12–15) of the original application of May 27, 1957, which were withdrawn on June 20, 1961, was filed on November 3, 1958. Claims 14, 17, 18, 19 and 20 were withdrawn November 4, 1959, in response to the examiner's ruling of May 15, 1959, that applicant should elect between method and track

---

7. The Kirst application is Ex. 16, and papers regarding the interference proceeding are to be found in Ex. 23. Kirst's "capitulation" in favor of Fiechter, in return for an exclusive license of the Fiechter patent to defendant (Ex. 26), constitutes the basis of plaintiff's "unclean hands" argument.

assembly claims. On July 20, 1959, the examiner held that (in addition to formal defects such as describing the bonding agent used by its properties, rather than "in definite terms and not in mere functional terms") the claims were unpatentable by reason of anticipation in prior patents (notably Poor, British patent No. 698,665 of Oct. 21, 1953, Ex. 30) and the disclosure in a 1957 treatise (Ex. 30) on epoxy resins that "in many cases in structural work, steel to steel epoxy adhesives metal joining is superior to bolt and weld joints."

In response to the technical defects of description, applicant amended on January 19, 1961, by adopting the description "composed predominantly of thermosetting resins of the type including an epoxy group."

The examiner on July 17, 1961, stood his ground, emphasizing that for a *method* patent, the nature of the specific materials or metal elements to be bonded together by an adhesive was "immaterial since the method steps are the same." In the final rejection on January 24, 1962, the examiner reaffirmed that "The patent to Poor shows track elements secured together with adhesive. The patent to Trible [8] discloses an epoxy resin used to join metal elements together . . . In view of the teaching of Lee and Neville [the 1957 treatise above mentioned] it would be a conventional expedient to use epoxy resin to join metal track elements."

On appeal from the final rejection the Board of Appeals accepted applicant's argument that in Poor the use of adhesive was merely to hold a part in place temporarily *before* installation of the rail and did not cover an adhesion for permanent operation in railroad service subject to mechanical stresses and weather. The Board of Appeals rejected the examiner's argument that "the method steps of joining the metal parts by epoxy is old and conventional in the art. The specific material or elements joined in the method *is not a step in the method* and therefore does not add patentability to the claim." [Italics supplied]. Only claims 3 and 6 were allowed by the Board of Appeals, the rejection of the other claims being affirmed. These were rewritten with appropriate formal changes by applicant on March 13, 1964, and the patent issued on June 30, 1964.

Having thus delineated the scope of Fiechter's claimed inventions, we turn to examination of the prior art to ascertain whether they are "new" or whether they merely represent ordinary mechanical developments which would be "obvious" to an artisan of ordinary skill in the pertinent art. We bear in mind that "in legal contemplation, one of ordinary skill in the art is chargeable with comprehensive knowledge of it." Contl. Can Co. v. Crown Cork & Seal Co., 415 F.2d 601, 603 (C.A. 3, 1969).

Can it be established by plaintiff, from the evidence of record in the case at bar, that the patents relied on by defendant teach "nothing of significance that has not already been disclosed"? 415 F.2d at 602. Can it be shown that Fiechter's "advance over the prior art, if any, required only the exercise of the skill of the art"? Detrola Corp. v. Hazeltine Corp., 313 U.S. 259, 269, 61 S.Ct. 948, 952, 85 L.Ed. 1319 (1941). Our analysis discloses that these questions must be answered in the affirmative.

■ Plaintiff points to a number of prior patents, not considered by the patent office, which substantially anticipate the claims asserted by Fiechter. The existence of such relevant prior art not considered by the patent office materially weakens the importance of the presumption of validity derived from 35 U. S.C. § 282. Scripto, Inc. v. Ferber Corp., 267 F.2d 308 (C.A. 3, 1959).

West German Gebrauchsmuster [9] No. 1,705,115, applied for on December 12,

---

8. The Trible patent is No. 2,974,080, of June 29, 1956, Ex. 30.

9. Literally "use-model", this type of patent protection is called by defendant a "petty or

1954, by the German Railroad System (Deutsche Bundesbahn), issued July 28, 1955, expiring January 1, 1961 (Ex. 4) makes the following claim:

> Elektrisch isolierende Befestingung der Eisenbahnschienen auf den Eisenbahnschwellen sowie elektrisch isolierende Verbindung der Eisenbahnschienen miteinander, dadurch gekennzeichnet, dass die Schienen (1) oder die daran befestigten Unterlagsplatten (2) mit den Schwellen (3), insbesondere Stahl-und Betonschwellen, sowie die Schienen unmittelbar miteinander, oder auch zusätzlich mit verstärkenden, an beiden Schienenenden anliegenden Laschen (4) mittels bekannter Metallkleber (5) festhaftend zusammengeklebt werden.

In English this would read:

> "Electrically insulating fastening of railroad rails to the railroad ties as well as electrically insulating connection of the railroad rails with each other, identified in this respect, that the rails (1) or the thereto fastened underlying plates (2) are firmly glued together by means of a known adhesive for metal (5) with the ties (3), especially steel and concrete ties, as well as the rails directly with each other or also additionally with strengthening fish-plates (4) lying along both rail-ends." [10]

The description of the advantages of this German invention emphasizes the reduction of maintenance costs, due to the absence of bolt-holes which would weaken the strength of the rails. Electrical insulation (necessary in connection with signals) is also emphasized. But defendant's patents likewise cover insulated joints. The insulation is afforded by the insulating properties of the adhesive itself. Defendant's method also permits non-insulated joints, when desired, by assuring metallic contact between the rails, rather than complete separation by adhesive material. This difference is not material, as the conductive properties of steel have been long known.

It is very clear that this invention and defendant's are essentially identical. Defendant's is stated in more verbose language, partly in response to criticisms from patent office examiners, but in substance both have the same features: fastening of rails together, or of rails with tie plates, or fish-plates, by means of glue.

This German patent was not considered by the United States Patent Office during proceedings which led to issuance of defendant's patents. Fiechter knew of the German patent no later than July 21, 1960 (Ex. 34). Whether Fiechter was or was not under any duty to bring this prior art to the attention of the United States Patent Office in connection with proceedings leading to his patents involved in the case at bar is immaterial in the present connection. But it is clear that the German invention of 1954 antedates Fiechter's claim of conception in July, 1955 (affidavit in interference proceedings Ex. 23; defendant's brief, pp. 21, 25).

Likewise the Neuweiler Swiss patent No. 236,552 of June 16, 1945, (Ex. 6) covers fastening rails to ties by means of adhesive. It does not cover joining the rails to each other by adhesive. The same inventor's Swiss patent No. 247,641 of December 1, 1947 (Ex. 10) is a method patent of the same scope.

---

design patent" (Brief, p. 31). Perhaps "utility model", a phrase appearing in 35 U.S.C. 184, is the most appropriate expression. Whatever its nature, it is of public record in the German patent office and serves to charge practitioners of what defendant calls the "railroad track, including rail joint, art" (Brief, p. 33) with notice of what it discloses. This would be particularly true since the German applicant was an operating railroad system and the invention was made "in

370 F.Supp.—43½

the course of service" ["Es handelt sich um eine Diensterfindung"]. This was no ivory-tower inventor, or airplane manufacturer, but an operating railroad. Nor does this patent refer to toy trains and tracks, as defendant contends (Oral argument, p. 27).

10. The numbers in parentheses refer to the drawings, which are quite clear and plain. A less literal but equally accurate translation is found in Ex. 5.

The same inventor's Swiss patent No. 259,372 of September 16, 1949 (Ex. 8), covers electrically insulated rail joints. It teaches the insertion of a layer of laminated insulating material, fastened together by adhesive (specifically mentioning Araldite, defendant's preferred bonding agent), along the fish-plates and between the butt ends of the rails. It should be noted, however, that this patent is primarily directed toward achievement of electrical non-conductivity, rather than the mechanical union of the rails with each other and with the ties. In fact it contemplates use of the customary bolts and screws, although insulating them by a cylindrical tube of insulating material. Moreover, the insulating sheets do not appear to be fastened by adhesive to the fish plates; and separate sheets are used for each rail end, with a space between them. The adhesive is therefore not intended as a bonding agent to replace bolts as a means of connecting the rails and fish plates together. Fiechter's method patent, however, permits "eliminating . . . bolts" and can produce joints which are either insulated or conducting, as may be desired.

Likewise, plaintiff points out, on April 3, 1957, a month before Fiechter's application, William E. Gadd, an employee of defendant, filed an application (Ex. 14) describing an improvement in the technology of gluing rails and joint bars together (by providing grooves or depressions to trap the glue), a technology which the application assumes as known and pre-existing. The file wrapper (Ex. 14) shows that the examiner (on July 11, 1958) referred to Ciba patents disclosing use of synthetic resinous glues to bond metal to metal, so that "fastening the joint bars to the rail by the use of an adhesive would not involve patentable novelty." Apparently this application was pursued no further, defendant preferring to rely on the Fiechter applications. The similar Kirst application (Ex. 15) filed September 6, 1957, was refiled as a continuation-in-part application on September 28, 1961 (Ex. 16), and led to the interference proceeding with Fiechter as previously described.[11]

We turn now to examination of defendant's contentions. Defendant relies chiefly upon the affidavit of Mark F. Smucker, retired manager of laboratory operations for the Association of American Railroads. Apparently Mr. Smucker was the channel upon which both plaintiff and defendant had to rely in order to secure adoption of their respective products in practice by railroads. Until he had conducted tests in 1959 Mr. Smucker would not have believed that it was possible to use adhesives in the railroad industry. However, Mr. Smucker repeatedly stated that he was not a chemist and knew nothing of the technology of resins, and did not understand it. Whenever he used adhesives in track experiments they were furnished "by others outside of the railroad industry."

Mr. Smucker's skeptical incredulity would seem to be one more illustration of the notorious technological backwardness of the railroad industry. Other well known examples are the agreements between railroads not to use air-conditioning in passenger trains until it could be adopted generally; delay in use of telephone communication with locomotives until long after its use in aviation; and, perhaps the most striking example, the development of diesel-powered locomotives by General Motors rather than by the railroad industry.

A preliminary legal question arises with respect to the pertinent art to govern the case at bar. The Court accepts fully Mr. Smucker's testimony that use of bonding agents in the railroading industry would have been and was regarded as revolutionary. Undoubtedly defendant could adduce additional proof to this effect as to the attitude of railroad men, but such proof is unnecessary. We

11. Final rejection of Kirst's application was affirmed by the Board of Appeals *circa* October 31, 1962. Ex. F to Glass affidavit of October 15, 1973.

accept Mr. Smucker's statements as established facts.

The question is, however, whether the attitude of the railroad industry is controlling here, or whether the state of the art in the resin technology field is the pertinent consideration.

■ We are convinced as a matter of law that when a known technology in one art is applied to a new use in another art, it is the state of the former rather than the latter art that governs patentability. The reason for this is simple but conclusive. The opposite conclusion would violate a basic principle of patent law, previously discussed, that the object of according inventors a patent monopoly is to promote new knowledge, not to withdraw from public use knowledge that is already attained and available.

Consequently, in the case at bar the pertinent art is not the psychology of railroad men but the state of resin technology, with respect to which Mr. Smucker admitted his lack of expertise.

As the file wrappers and patents in the record show, the objective data disclosed by prior art in the adhesive field indicated characteristics which were plainly adapted to use in the railroad industry.

Defendant relies heavily upon a statement in the specifications of Ciba's Swiss patent 251,467 of September 1, 1948, (Ex. E to Glass affidavit of October 15, 1973, p. 2, col. 2, lines 56–59; equivalent language in Australian patent 133,819 (PX–3), col. 4, lines 23–28) to the effect that "it is not possible . . . to arrive at any conclusion with regard to the technical value of adhesive bonds in materials subjected to strong mechanical stresses" (Brief, p. 32).

Defendant interprets this passage as being practically a warning not to use the Ciba adhesive on a railroad track because "we don't know what is going to happen" (Oral argument, p. 21) in view of the stresses and temperature fluctuations to which rail joints are subjected in railroad service.

However, careful reading of this language in context indicates that the Ciba applicant was there speaking, *not of his own invention, but of the prior art upon which he was improving*. Ciba's own invention, involving the use of a separate hardening agent and the use of heat to produce a thermosetting bond, was described as extremely strong and effective in uniting metal with metal. Tables were provided showing the shear strength of adhesions between steel and steel and between other metals, under varying conditions.

■ Consequently, defendant's revolutionary application of resin technology in the railroad field was simply a new use for a known product. This is traditionally unpatentable. A leading case is Hotchkiss v. Greenwood, 11 How. 248, 266, 13 L.Ed. 683 (1851), involving the substitution of clay in place of metal or wood in making doorknobs. Concrete Appliances v. Gomery, 269 U.S. 177, 184, 46 S.Ct. 42, 70 L.Ed. 222 (1925), involved conveyance of wet concrete by gravity by means of devices previously used to transport water, grain, and coal. In Stanley Works v. Rockwell Mfg. Co., 106 F.Supp. 311, 313, 315 (W.D.Pa. 1952), aff'd 203 F.2d 846, 848 (C.A. 3, 1953), non-glare lighting by use of two sources on a grinding wheel, the process having been previously used in showcases, scales, mirrors, typewriters and the like, was held unpatentable.

■ From the foregoing it follows that the Fiechter patents are invalid and plaintiff is entitled to a declaratory judgment to that effect. Defendant's counterclaim for infringement must be dismissed.

For the sake of completeness we discuss the license dispute under 35 U.S.C. §§ 184 and 185. Fiechter's application which matured into the joint patent was filed on May 27, 1957. That application contained 15 claims and covered "Railway Rail Joint and Method of Making It." It was not until June 20, 1961, that applicant cancelled claims 12–15 (the method claims) which were refiled as elaborated in a new continuation-in-part

application which matured into the method patent (Ex. 2). This new application was filed on November 3, 1958. (Ex. 29).

A French application was filed on May 23, 1958, which led to French patent No. 1,354,102 issued January 27, 1964 (Ex. 17). From May 27, 1957, to May 23, 1958, was more than six months, indeed almost twelve months.

Therefore there was no requirement for a license under 35 U.S.C. § 184, provided that the French application was substantially identical with the earlier United States application.

One might suppose *a priori* that since the original United States application covered both the product and the process claims the French patent, even if it primarily related to the method claims, would show sufficient similarity to the American disclosures to be free of the license requirement. The French patent (Ex. 17) does in fact embody both process and product claims. Plaintiff contends that the French application is the same as the method application which was filed in the United States on November 3, 1958, and which matured into the method patent (Brief, p. 20). The diagrams in the French patent are the same as those in the method patent.

But the present record is inadequate to serve as the basis of a meaningful comparison between the French application and the original American application. It does not contain the original French application (as distinguished from the patent ultimately issued) nor does it contain the French equivalent of the file wrapper, to illuminate developments during processing in the French patent office.

Moreover, even assuming that the French application was the same as the American method application, additional evidence would be needed to assess the significance of the difference between the American product and process patents. The chief difference seems to be the differential heat treatment to produce an interference fit. But whether this is a feature of importance has not been developed by either of the parties.

Accordingly we are unable to dispose of the issue with respect to the license requirement by summary judgment on the present record.

The same conclusion applies to plaintiff's further contention as to unclean hands. The record as it now stands, accepting the affidavits of the inventors in interference, plainly discloses priority on the part of Fiechter. The concession by Kirst could well have been based upon a legitimate recognition that his cause was hopeless rather than upon collusion. Moreover, it is a general principle of law that allegations of fraud require clear proof. More evidence would be needed to adjudicate that issue here. Furthermore, proof might be pertinent regarding the level of ethics generally practiced in interference cases. The *cosi fan tutti* defense of some Watergate participants, that they did no more than others had done previously, or ordinarily do, might be available. Mere trial tactics rather than fraud upon the patent office and the public may explain what was done here. While heartily endorsing the doctrine proclaimed by Mr. Justice White in United States v. Singer Mfg. Co., 374 U.S. 174, 199–200, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963), we are not in a position to make an intelligent determination with respect to the clean hands issue upon the present record.

Fortunately, these ancillary arguments of plaintiff may be regarded as window-dressing on the cake, which become academic in view of our determination with respect to invalidity. Summary judgment for plaintiff on this issue will afford adequate relief. Unless our judgment on this issue should be overturned on review, there may well be no occasion to pursue further the obscurer by-paths of the pending controversy.

This opinion shall be deemed to embody the Court's findings of fact and conclusions of law. Plaintiff's counsel, upon notice, shall submit an appropriate judgment giving effect to the determination here reached.