**FEDERAL LABORATORIES, INC., Plaintiff,**

v.

**BARRINGER RESEARCH, LTD., and Intex, Inc., Defendants.**

Civ. A. No. 80–925.

United States District Court, W. D. Pennsylvania.

Oct. 26, 1981.

---

756

Stanley J. Price, Jr., Pittsburgh, Pa., for plaintiff.

Thomas C. Wettach, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Richard G. Lione, Chicago, Ill., for defendants.

## OPINION

DUMBAULD, District Judge.

█ In accordance with recognized practice in patent cases, plaintiff, rather than awaiting an infringement action by the patentee, brought suit under 28 U.S.C. § 2201 for a declaratory judgment that defendant Barringer's patent 3,340,221 [1] is invalid and not infringed. The technique of seeking a declaratory judgment of invalidity rather than awaiting an infringement suit by the patentee or assignee is a well recognized procedure. *Dewey & Almy Chemical Co. v. American Anode Inc.*, 137 F.2d 68, 69–70 (C.A. 3, 1943); *Thiokol Chemical Corp. v. Burlington Industries Inc.*, 448 F.2d 1328, 1331 (C.A. 3, 1971); *Allegheny Drop Forge Co. v. Portec, Inc.*, 370 F.Supp. 673, 674 (W.D.Pa.1974). Plaintiff attaches a pendent claim under state law for unfair competition against defendant Intex, Inc., a licensee of defendant Barringer, by reason of threats of patent infringement suits against plaintiff's customers and potential customers.[2] Plaintiff has filed a motion for summary judgment [3] and defendant Barringer has filed a motion to stay proceedings pending action by the Patent Office on an application by Barringer for reissue of the patent in suit (hereinafter referred to as '221) after consideration of prior art which was not before the Patent Office during the proceedings resulting in issuance of the patent, but which have been relied on by alleged infringers in this and other patent litigation involving '221.

In view of the fact that ultimately the question of patent validity is one for the Court, and that the authorities to be presented to the Patent Office in the reissue proceeding are the same as have been developed in extensive affidavits and depositions now before this Court, it would seem appropriate in the interest of judicial economy [4] to proceed to consider without further delay the materials at hand. Defendant

---

1. Defendant Barringer Research, Ltd. is assignee of this patent, issued on February 25, 1969 with Dr. Anthony R. Barringer and two other persons identified as the inventors. The corporate defendant is referred to herein as "Barringer." The company's name has now been changed to "Barringer Resources."

2. As is often the case, this claim is perhaps a make-weight. Plaintiff's counsel at argument indicated that this matter could probably be disposed of readily once the underlying patent issue is determined. The instant controversy appears to be a legitimate patent litigation, with merits arguable on both sides, rather than a clear abuse of patent monopoly. Cf. *Analytichem International Inc., v. Har-Len Associates, Inc.*, 490 F.Supp. 271, 274–75 (W.D.Pa.1980).

3. The provision of Rule 56(c) FRCP that summary judgment shall be granted if the papers on file show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" applies to all cases, including patent and antitrust cases. However, it is utilized less frequently in that type of cases because there the facts are often obscure and complex. Where appropriate, however, summary judgment is properly available in a patent case, e. g. *Allengheny Drop Forge Co. v. Portec, Inc.*, 370 F.Supp. 673 (W.D.Pa.1974), aff'd 541 F.2d 383 (1976); *Alco Kar Kurb Inc. v. Ager*, 181 F.Supp. 97, 100, 104 (D.N.J.1960), aff'd 286 F.2d 931 (C.A.3, 1961).

4. Moreover, with respect to justice in adjudication of the merits, plaintiff also contends, and apparently correctly, that in the reissue proceedings the applicant would proceed *ex parte* except to the extent that the Patent Office might consider the participation of adverse parties useful in facilitating its consideration of the case, whereas consideration by the Court would afford complete due process in an adversary proceeding.

Barringer's motion to stay is therefore denied.

We commence by analyzing the patent in suit:

The nature of the invention claimed is well described in the abstract at the beginning of the patent.

A proximity detector employing a loop or coil positioned in proximity to an electrically conductive object to be detected. The coil is energized with electric current pulses of predetermined width with predetermined intervals between successive pulses. Transients induced in the coil due to decaying eddy currents flowing in the object are detected during the intervals between successive pulses, when the electromagnetic field created by the pulses is absent or is not time varying. The transients are separated from the remainder of the currents flowing in the coil and are converted into a signal suitable for controlling a relay, actuating a counter, etc.

This description is elaborated in the first claim:[5]

A proximity detector for detecting the presence of electrically conductive objects, comprising:

(a) a coil positioned in proximity to the object to be detected,

(b) a signal generator connected to said coil for energizing said coil with a repetition of electric current primary pulses of predetermined width and with intervals between them during which the electromagnetic field produced by said primary pulses is absent or not time varying,

(c) receiving means for detecting signals induced in said coil including means for separating from said primary pulses any transient signals which are induced in said coil during said intervals, said transient signals being attributable to decaying eddy currents flowing in said object, and

(d) control means connected to said receiving means and responsive to said transient signals for producing a control signal the existence of which is indicative of the presence of said object in proximity with said coil.[6]

Possible applications of the invention mentioned in the patent include control of traffic lights, counting the number of vehicles passing the point of installation, measuring speed of vehicles or the level of fluid in a tank, counting units in a production line, or monitoring food processing to detect the presence of foreign metallic objects.

Plaintiff contends that the patent in suit is invalid by reason of prior art known to applicant but not presented to the Patent Office, in particular two patents previously granted to Barringer himself.[7] These are patents 3,020,471, issued February 6, 1962, and 3,105,934, issued October 1, 1963, and reissued as RE 25,908 on November 16, 1965. Patent '471 is entitled "Method and Apparatus for the Detection of Ore Bodies."

It is of course true, as defendant emphasizes, that the outward trappings of the inventions embodied in Patent '471 and the patent in suit are far different. Patent '471 seeks to locate "base metal deposits" or ore bodies concealed in non-conductive rocks. The patent in suit '221 detects metal artifacts such as automobiles (or weapons, as in the challenged device manufactured by plaintiff). Patent '471 depicts an airborne device with the transmitter located in an airplane and the receiver in a trailing "bird" towed by the aircraft. The patent in suit describes a device buried in the ground underneath a highway over which cars pass.

But these differences, though dramatic, are superficial. The technique for detecting the presence of metal is substantially similar, if not identical. The essential fea-

---

5. Claims 2–5 relate to apparatus.

6. Defendant's device uses a single coil as both transmitter and receiver of impulses. Plaintiff's accused device has separate coils. Whether this difference is significant with re-

spect to infringement we do not now pause to consider.

7. Dr. Anthony R. Barringer, the inventor in Patents 3,020,471 and 3,105,934, was a co-inventor in Patent 3,430,221, the patent in suit.

ture of the method taught in '471 is to use a powerful pulsating, time-separated primary electromagnetic field which is terminated at suitable intervals so that the secondary field generated by the current induced in the conductive metal may be measured without interference from the powerful primary field. Dr. Barringer's deposition testimony shows that he considers "any pulse system," as contrasted with the earlier continuous wave systems, as an infringement of his '221 patent. (Vol. I, attachment 1 to Ex. B, D.Colo. No. 81–Z–116, pp. 26–27, 30). Likewise, as has been seen, a variety of uses are specified in the '221 patent itself: activation of traffic signal, monitoring level of liquid in a tank or food processing line, and the like. But apparently Dr. Barringer seeks to limit the use of the "pulse principle" in his earlier patents to "geophysical" or "airborne" systems, which he regards as a different kettle of fish from a "proximity detector." (*Ibid.*, 20–21, 61–64, 107). Patents '471 and '221 are fundamentally similar, but much complex refinement is necessary in an airborne system (*e. g.*, to eliminate signals caused by engine operation) which is not required in the simpler proximity detector. (*Ibid.*, 109, 113, 117).

As stated in patent '471:

"this invention employs a high powered pulse of a million watts or more generated two or three times per second. These pulses, which flow in a very large loop around the aircraft, radiate powerful electromagnetic fields which in turn induce pulses of circulating currents in underlying conductive zones. These induced current pulses continue to flow for a short period after the energizing pulses have been terminated, the current gradually decreasing to zero. This phenomenon is called a transient effect and the lagging current transient effect is accompanied by a similar effect in the associated secondary electromagnetic field gener-

ated by the induced currents. Thus the conductive zone is said to have a transient response to an energizing, pulse type electromagnetic field, and this transient response lags in time behind the energizing pulse. Thus, according to the invention, the transient secondary electromagnetic field may be measured without the presence of an overriding primary field."

The main object of the invention is to obtain information regarding the characteristics of an ore body by means

"in which the ore body is energized as a conductor with an electrical current, thereby to generate an electromagnetic field in the conductor adapted to radiate therefrom, and in such manner that the energizing of the conductor is abruptly terminated to provide a collapse of the electro-magnetic field in the conductor, whereby the collapsing characteristic of the magnetic field may be detected and measured to determine characteristics thereof, thereby to obtain information concerning the nature of the conductor and the ore body which it defines."

This is precisely the means of detecting "an electrically conductive object" described in the above-quoted abstract and claim 1 of the patent in suit '221.

Barringer's other prior patent cited by plaintiff as prior art is '934 "for the remote detection of ore bodies utilizing pulses of short duration to induce transient polarization in the ore bodies."[8]

Here, too, the identical technique taught in '471 and '221 is set forth. Among the objects of the invention claimed in '934 and RE 25,908 is to provide means "for the measurement of the secondary field of a conductor whilst the primary field is eliminated . . . utilizing a discontinuous electromagnetic wave form to energize the conductor."

---

8. Again, as with '471 there is a superficial verbal distinction from the patent in suit '221. Patent '934 speaks of "remote detection," while '221 speaks of a "proximity detector." Whether the conductive object to be detected is remote or near is immaterial except that the power and design of the device must be appropriate for the intended use.

Plaintiff also mentions as prior art the Colani patent, 3,315,155. The object of the invention covered by this patent is to investigate "inhomogeneities" occurring in a particular portion of a relatively homogeneous medium, by comparing the respective decay times of secondary magnetic field pulses in the anomalous area with the decay times in the homogeneous portion of the medium.

"The distinctive feature of the invention is the use of a primary magnetic field which is caused to decay very rapidly and which induces a secondary magnetic field within the medium to be examined, this secondary magnetic field decaying comparatively slowly, so that the great difference in time constants of the decay times permits, after some time, the separation of the signals in the receiver."

This patent does not state what it is to be used for. Dr. Barringer regards it as a remote sensing device rather than a detector of objects in "close proximity." (Deposition, *supra*, p. 70.) It is said it could be used to detect the presence of a submarine in water. Apparently plaintiff relies upon the Colani patent to anticipate the use of a ¬ingle coil as transmitter and receiver, as in patent '221 as distinguished from the separate coils used in plaintiff's accused device.[9]

Plaintiff also refers to various publications in scientific journals which show that the measurement of resistivity in metal bars by measuring the decay of eddy currents was known some years before the application which resulted in the patent in suit was filed. Other articles discussed use of pulsed eddy current fields for measuring the thickness of metal some years before filing the application which led to '221.

■ The standard of patentability under the current statute is set forth in *Graham v.* *John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966), expounding 35 U.S.C. § 103. Three factors are to be taken into consideration: (1) the scope and content of the prior art; (2) difference between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art, and whether the differences between the prior art and the claimed invention are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains.[10]

■ Applying the *Deere* standard to the case at bar, we note that, as became evident in discussing the prior Barringer patents, the prior art was cognizant of the method of determining the presence of metal or other conductive media by means of measuring the decay of eddy currents induced by a transmitted electromagnetic field. The technique used in the patent in suit is identical with that taught in the prior Barringer patents. The differences between the prior art and the claims of '221, as we have previously noted, are superficial, though dramatic with respect to outward circumstances (airborne v. underground, remoteness v. proximity).

As to the level of ordinary skill in the art, it seems clear that a high degree of proficiency is characteristic of the industry. This is plain from Dr. Barringer's description of his own organization, which manufactures for the nuclear industry, carries out research and development projects both in-house and for other companies and government agencies in the United States and Canada. In connection with these activities the company maintains a professional staff amounting to about one-third of its total personnel, and many of the staff hold

---

**9.** See note *6, supra.*

**10.** Section 103 also prescribes that "Patentability shall not be negatived by the manner in which the invention was made." This sentence was enacted to abolish the judicially formulated "flash of genius" test. See 383 U.S. at 15,

86 S.Ct. at 692. See also *Sinclair & Carroll Co. v. Interchemical Corp.,* 325 U.S. 327, 335, 65 S.Ct. 1143, 1147, 89 L.Ed. 1644 (1945). An invention is now patentable if it resulted from a process of elimination using a list of possible ingredients to meet the needed requirements

high academic degrees. Design capabilities and engineering capabilities cover a broad field of instrumentation. (Deposition, *supra*, p. 11).[11]

Against this background it seems clear that the use of eddy current technology to determine the presence of metal objects would have been obvious, in September 1965, to persons of ordinary skill in the art to which the subject matter of the patent in suit pertains.

We conclude, therefore, that the patent in suit (No. 3,430,221) is invalid. We deem it unnecessary to determine at the present stage whether plaintiff's device for use at airports and similar security checkpoints constitutes an infringement, because if the case were to be retried on that point it would not involve difficult or protracted proceedings.

In all probability, the fact that plaintiff uses two or more coils rather than one, would not be significant, under the doctrine of equivalents. See *Rengo Co. Ltd. et al. v. Molins Machine Co. Inc.*, 657 F.2d 535, 550, 552 (C.A. 3, 1981).

For similar reasons, we make no disposition at the present time of plaintiff's pendent cognate claim of unfair competition under state law.[12]

For the foregoing reasons, Plaintiff's motion for summary judgment is granted.

---

(or indeed from a computer search for the needed item).

11. The sophisticated experimental and mathematical technique displayed in the publications

from scientific journals cited by plaintiff also demonstrate a high level of skill prior to 1965.

